UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Peter DiMeglio, Anthony DiMeglio, Carlo DiMeglio, and Timothy Hatch,<br><br>Plaintiffs,<br><br>v.<br><br>Empire Offshore Wind LLC, Empire Leaseholder LLC, Equinor Wind US LLC, and Equinor US Holdings Inc.,<br><br>Defendants. | Case No. ________________<br><br>Jury Trial Requested |

## COMPLAINT

Plaintiffs Peter DiMeglio, Anthony DiMeglio, Carlo DiMeglio, and Timothy Hatch, by and through their undersigned counsel, as and for their Complaint, state and allege as follows:

## INTRODUCTION

1. Defendants Empire Offshore Wind LLC, Empire Leaseholder LLC, Equinor Wind US LLC, and Equinor US Holdings Inc. (together "Empire Wind") have catastrophically damaged the livelihood of each Plaintiff, his family, and his community. These fishermen continue a proud multi-generational tradition of lobster and tautog harvesting in the state and federal navigable waters off Long Island. For decades they have set and hauled lobster

pots on traditional lobster and tautog grounds, a natural marine environment that has provided Long Islanders with fresh lobster and tautog for centuries. Empire Wind killed the lobster and tautog industry in those Long Island waters in mere months.

2. This is an action for damages. Federal maritime law has a long and enduring tradition of protecting the economic interests of commercial fishermen. Empire Wind devastated Plaintiffs' entire fishing careers, a livelihood that supported their families and communities. Before Empire Wind devastated the lobster and tautog's marine environment, Plaintiffs consistently had ample catches, with each haul turning naturally on the seasons, precise locations of each pot during seasonal fluctuations, and the hard work and routines that only an experienced lobster and tautog fisherman can know. But because of Empire Wind's actions, these same fishing locations are today barren, regardless of the time of year, time of day, or Plaintiffs' combined sweat and tears.

3. Empire Wind knew that their construction efforts and offshore windmills would inflict economic harm on commercial fishermen. That is why they developed a compensatory–mitigation program, one ostensibly designed to compensate commercial fishermen for economic losses caused by Empire Wind's actions. But that was never a serious program. It is instead only designed to procure litigation releases at bottom dollar.

4. Plaintiffs Anthony DiMeglio and Peter DiMeglio sought to utilize Empire Wind's compensatory–mitigation program last year. Anthony provided Empire Wind with a verified gear–loss total of $30,375 and Peter provided Empire Wind with a verified gear–loss total of $29,401. Plaintiffs together conservatively estimated economic losses of $3,466,000, an amount provided to Empire Wind in good faith before a thorough evaluation of damages by financial experts, and before recognizing the full and catastrophic devastation that Empire Wind's actions have caused.

5. Empire Wind responded by requesting that Plaintiffs labor through a bureaucratic, closed–door process managed by "equinor" and "de maximis." In exchange for a full release, Empire Wind ultimately offered Plaintiffs Carlo DiMeglio and Peter DiMeglio a standardized, declining schedule of payments beginning at $4,516 for 2025, and falling to $536 by 2031, resulting in total compensation of approximately $10,438 per vessel over seven short years.

6. Plaintiffs do not oppose offshore wind energy or obtaining alternative clean sources of energy for Long Islanders. But the millions that Empire Wind has made to capitalize on this demand has had a profound detrimental economic impact on commercial fishing. Empire Wind's destruction of the American lobster's and tautog's natural habitat off Long

Island means that Plaintiffs have lost their careers and livelihood, a harm that can only be compensated through damages, the amount to be proven at trial.

## JURISDICTION AND VENUE

7. This Court has jurisdiction under 28 U.S.C. § 1332 because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the dispute is between citizens of different states.

8. This Court also has jurisdiction under 28 U.S.C. § 1333(1) because this action arises from torts committed by vessels and maritime operations on navigable waters bearing a substantial relationship to traditional maritime activity, and Plaintiffs' claims are cognizable under the general maritime law. Plaintiffs bring their maritime claims at law pursuant to the saving–to–suitors' clause and demand trial by jury.

9. This Court has supplemental jurisdiction over Plaintiffs' New York law claims under 28 U.S.C. § 1367 because those claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy

10. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omission giving rise to the claim occurred in waters adjacent to this judicial district, with certain property related to this claim making landfall within this judicial district.

## PARTIES

11. Plaintiff Peter DiMeglio is an individual who resides at 129 Bretton Road, Yonkers, New York 10710.

12. Plaintiff Anthony DiMeglio is an individual who resides at 50 Hilcrest Avenue, Ardsley, New York 10502.

13. Plaintiff Carlo DiMeglio is an individual who resides at 129 Bretton Road, Yonkers, New York 10710.

14. Plaintiff Timothy Hatch is an individual who resides at 1027 Shelburne Drive, Franklin Square, New York 11010.

15. Upon information and belief, Defendant Empire Offshore Wind LLC ("Empire Offshore Wind") is a Delaware limited liability company with its principal place of business located in Stamford, Connecticut. Empire Offshore is the developer and operator of the Empire Wind 1 project.

16. Upon information and belief, no member of Empire Offshore Wind is a citizen of New York, with its membership interests being held, directly or indirectly, by the Equinor corporate family and ultimately by Equinor ASA, a Norwegian company located in Stavanger, Norway, which is itself owned by the Kingdom of Norway through a majority 67% share in all holdings.

17. Upon information and belief, Defendant Empire Leaseholder LLC (Empire Leaseholder") is a Delaware limited liability company with its

principal place of business located in Stamford, Connecticut. Empire Leaseholder is the holder of federal renewable energy lease OCS–A 0512.

18. Upon information and belief, no member of Empire Leaseholder is a citizen of New York, with its membership interests being held, directly or indirectly, by the Equinor corporate family and ultimately by Equinor ASA, a Norwegian company located in Stavanger, Norway, which is itself owned by the Kingdom of Norway through a majority 67% share in all holdings.

19. Upon information and belief, Defendant Equinor Wind US LLC ("Equinor Wind") is a Delaware limited liability company with its principal place of business located in Stamford, Connecticut.

20. Upon information and belief, no member of Equinor Wind is a citizen of New York, with its membership interests being held, directly or indirectly, by the Equinor corporate family and ultimately by Equinor ASA, a Norwegian company located in Stavanger, Norway, which is itself owned by the Kingdom of Norway through a majority 67% share in all holdings.

21. Upon information and belief, Defendant Equinor US Holdings Inc. ("Equinor US Holdings") is a Delaware corporation with a principal place of business in Stamford, Connecticut.

22. Upon information and belief, Equinor is the parent of Equinor Wind with its membership interests being held, directly or indirectly, by the Equinor corporate family and ultimately by Equinor ASA, a Norwegian

company located in Stavanger, Norway, which is itself owned by the Kingdom of Norway through a majority 67% share in all holdings.[1]

## FACTUAL ALLEGATIONS

### *Plaintiffs' Fishing Operations on Traditional Grounds*

23. Plaintiffs Peter DiMeglio, Anthony DiMeglio, Carlo DiMeglio, and Timothy Hatch are commercial pot fishermen who target American lobster, and tautog in the waters of the New York Bight, New York Harbor approaches, the south shore of Long Island, and Lobster Management Area 4.

24. Plaintiffs' fishing operations are multigenerational family enterprises. The DiMeglio family has fished these waters for decades, operating the vessels MY WAY, MY WAY II, and MY WAY III as a family fleet. Plaintiff Hatch has likewise fished these waters for decades aboard the RAINBOW II.

25. Peter DiMeglio holds a New York State lobster license, food and fish license, and a federal lobster license, which includes Jonah Crab as a by–catch.

[1] These defendants are the ones Plaintiffs know of to the best of their knowledge currently. Further discovery may reveal other subsidiaries or members of the Defendants' business structures; Plaintiffs reserve all rights under the Federal Rules of Civil Procedure to amend their pleadings to add additional Defendants as discovery reveals them.

26. Carlo DiMeglio holds a New York State lobster license, food and fish license, and a federal lobster license, which includes Jonah Crab as a by–catch.

27. Anthony DiMeglio holds a New York State lobster license, food and fish license, a shellfish digger license, and a federal lobster license, which includes Jonah Crab as a by–catch.

28. Timothy Hatch holds a New York State lobster license, food and fish license, a dealer permit and a federal lobster license, which includes Jonah Crab as a by–catch

29. Pot fishing depends on fixed gear deployed on specific and productive bottom. A pot fisherman's knowledge of productive grounds—accumulated over decades and recorded in logbooks, chart plotters, and irreplaceable family knowledge—is the principal capital asset of his business, together with his gear and vessel.

30. Plaintiffs' traditional and customary grounds lie in and around the area now occupied by the Empire Wind 1 lease area and its export cable corridor, including grounds within the territorial waters of the State of New York and grounds on the adjacent Outer Continental Shelf.

31. Before Empire Wind's construction activities began, Plaintiffs' grounds were consistently productive, with Plaintiffs' verified landing records and historical catch data establishing a stable earnings base. Plaintiffs

typically landed between 500–600 pounds of lobster and/or tautog per trip. Now, in the same areas, under the same seasonable conditions, they land under 75 pounds, often finding Lobster traps empty.

***The American Lobster and Tautog***

32. *Homarus americanus*, more commonly known as the American lobster, is a marine decapod crustacean native to the Northwest Atlantic Ocean, characterized biologically and commercially as a benthic organism (i.e., bottom–dwelling) requiring specific deep–water or coastal marine habitats to mature. They prefer rocky reefs, boulders, crevices, and areas with three–dimensional structures where they can dig and maintain burrows to hide from predators, such as what used to be found in the waters of Long Island prior to Empire Wind's activities.

33. *Tautogogo onitis*, more commonly known as the tautog, blackfish, tog, chinner, oyster–fish, or chowder fish, is a stout, heavy–bodied fish with a blunt nose, thick lips, an arched head, and sharp dorsal/pelvic spines. It has large front conical teeth and strong, human–like rear crushing teeth adapted for feeding on hard-shelled crustaceans and mollusks (e.g., crabs, clams, mussels, and oysters). Its coloring is dark green to black or mottled dorsal side, fading to a lighter belly with a distinct white chin patch (particularly pronounced in males).

34. Tautogs inhabit inshore rocky structures, artificial reefs, wrecks, and shellfish beds, such as what used to be found in the waters off Long Island prior to Empire Wind's activities.

35. Prior to Empire Wind's activities, the waters off Long Island contained numerous wrecks and artificial reefs. The seabed contained expansive rocky structures and shellfish beds.

***The Empire Wind Project***

36. Empire Wind 1 is an approximately 810–megawatt offshore wind project under construction in federal renewable energy lease area OCS–A 0512, located in the New York Bight south of Long Island.

37. The project comprises fifty–four wind turbine generators, an offshore substation, inter–array cables, and a submarine export cable system running approximately forty–one nautical miles to a landfall at the South Brooklyn Marine Terminal in Sunset Park, Brooklyn.

38. The export cable corridor traverses the Lower Bay of New York Harbor and waters of the State of New York, crossing or adjoining grounds fished by Plaintiffs.

39. The Bureau of Ocean Energy Management ("BOEM") issued a Record of Decision for the Empire Wind projects in November 2023 and approved Empire Wind's Construction and Operations Plan ("COP") in February 2024, subject to conditions.

40. The COP approval conditions include obligations concerning fisheries communication and coordination, avoidance and mitigation of impacts to commercial fishing, procedures for fishing gear loss and damage claims, and the establishment of fisheries compensatory mitigation, including a compensation framework approved by BOEM and the New York State Department of State, with review and input from the New Jersey Department of Environmental Protection.

41. Offshore construction, including monopile foundation installation, began in 2024 and continued through 2025, with all fifty–four monopile foundations reported installed by late 2025.

42. Trenching, cable–laying, cable–pulling, and subsea rock installation along the export cable corridor were conducted during 2025 and 2026, employing cable–lay vessels, trenching barges, rock installation vessels, survey vessels, and support craft.

43. Construction activities have been accompanied by safety zones, navigation restrictions, advisories, and construction vessel traffic that exclude or impede fixed-gear fishing in and around the lease area and cable corridor.

44. Empire Wind's marine construction actions, and their resultant changing of the seabed, has caused the area to be uninhabitable to the American lobster.

### *Empire Wind Destroys Plaintiffs' Noticed Gear After Contrary Assurances*

45. In April 2025, Plaintiffs Peter DiMeglio and Anthony DiMeglio notified Empire Wind of the exact locations of their deployed pots and associated gear in and near the project's marine operations areas.

46. In response, Empire Wind or its agents gave assurances that only sonar survey work, not bottom–disturbing operations, would occur in the area of Plaintiffs' deployed gear during the relevant period.

47. In reliance on those assurances, Plaintiffs Peter DiMeglio and Anthony DiMeglio left their gear deployed in its noticed locations.

48. Notwithstanding the notice, and contrary to the assurances, construction and marine operations conducted by or for Empire Wind proceeded directly through the area of the noticed gear during April 2025, engaging in bottom-disturbing activity.

49. At no point did either Plaintiff Peter DiMeglio or Plaintiff Anthony DiMeglio give Empire Wind consent or permission to disturb, damage, or destroy their gear.

50. When Plaintiffs Peter DiMeglio and Anthony DiMeglio attempted to retrieve their gear, they found that it had been lost or destroyed.

51. Both captains documented the condition and absence of their gear photographically at the time of attempted retrieval.

52. Plaintiff Anthony DiMeglio submitted a verified gear–loss claim to Empire Wind totaling $30,375, representing physical damage to and loss of his gear traceable to Empire Wind's construction.

53. Plaintiff Peter DiMeglio submitted a verified gear–loss claim to Empire Wind totaling $29,401, representing physical damage to and loss of his gear traceable to Empire Wind's construction.

54. By letters dated November 7, 2025, Empire Wind denied all claims, offering only nominal compensation for some relocated pots.

55. Several factual assertions contained in the denial correspondence were inaccurate, including assertions contradicted by the photographic documentation and the prior notice of gear locations.

56. Plaintiff Timothy Hatch suffered loss of gear totaling approximately $2,500 caused by physical damage to and loss of his gear traceable to Empire Wind's construction.

57. Plaintiff Carlo DiMeglio suffered loss of gear totaling approximately $1,700 caused by physical damage to and loss of his gear traceable to Empire Wind's construction.

58. Empire Wind's conduct in proceeding with bottom–disturbing operations through gear whose precise locations had been disclosed to them, without permission and after giving express contrary assurances, was undertaken with reckless disregard for Plaintiffs' property and rights.

### *Displacement, Interference, and Loss of the Fishery*

59. Since the commencement of offshore construction, Plaintiffs have experienced substantial and continuing interference with their operations, including loss of access to traditional fishing grounds within and around the lease area and cable corridor, displacement of gear and of fishing effort to less productive and more distant grounds, obstruction of customary transit and gear–tending routes by construction traffic, safety zones, and navigation restrictions, and gear conflicts with project vessels and equipment.

60. Plaintiffs have further experienced economically catastrophic declines in catches on these grounds because Empire Wind has fundamentally damaged, destroyed, and transformed what was once a natural American lobster habitat.

61. Where grounds had previously been productive and abundant for decades, Plaintiffs now find their pots barren because of Empire Wind's trenching, cable–laying, rock installation, anchor handling, and its related seabed disturbance.

62. Specifically, Empire Wind removed wrecks and artificial reefs from the seabed, including one instance where, upon information and belief, Empire Wind was specifically told not to remove a wreck but did so anyways. Empire Wind also raked the seabed to remove rock formations and paved the seabed

with gravel to create a smooth path. This destroyed the natural marine habitats of both the tautog and American.

63. Construction activities of the type conducted by Empire Wind generate seabed disturbance, sediment suspension and redeposition, turbidity, noise, and, upon energization of submarine cables, electromagnetic fields, which affect the American lobsters' ability to live in affected areas.

64. These conditions have been found by published, peer–reviewed research to cause behavioral alteration and impairment with the American lobster, including adverse effects on benthic habitat and fixed–gear fisheries.

65. Moreover, construction itself can, and upon information and belief, did, in fact, kill American lobsters that were living in the affected area, or otherwise caused American lobsters to relocate to suitable marine environments that are outside zones that Plaintiffs can legally fish. It also did, upon information and belief, destroy the habitat that tautog lived in, causing them to migrate to other waters and killed tautog during the construction operations.

66. Empire Wind's windmills operations also create noise and vibration that cause stress to American lobsters. Instead of coming to Long Island waters to mate and molt, they instead avoid the waters in favor of waters without noise and vibration.

67. The interference alleged herein is continuing and likely irreversible.

68. Empire Wind's actions remain ongoing, with project vessels continuing to transit and work the corridor and lease area, and the project's structures and energized cables will remain in and on the seabed for the foreseeable future.

69. Before it engaged in any construction, Empire Wind knew about the dangers to damaging the American lobster's natural marine habitat and its likely negative impact on commercial fishermen. This is demonstrated, in part, by the BOEM's approval of Empire Wind's COP, a plan that included marine environmental protections and the establishment of fisheries compensatory mitigation and compensation plan framework.

70. Empire Wind intentionally disregarded the known dangers to damaging the American lobster's natural marine habitat and its certain negative impact on commercial fishermen.

71. Empire Wind's intentional disregard of the known dangers to damaging the American lobster's natural marine habitat, and its certain negative impact on commercial fishermen, demonstrates a callous disregard for the rights of commercial fishermen, actions that were intentional, wanton, reckless, malicious, and/or grossly negligent.

72. As a direct and proximate result, each Plaintiff has suffered, and continues to suffer, loss of income, loss of catch, loss of productive fishing access, increased operating costs, and damage to and loss of gear, and each faces a threatened long–term reduction of earning capacity, in amounts to be proven at trial.

## COUNT I
## Negligence Under General Maritime Law
## (Loss of Property)

73. Plaintiffs reallege and reincorporate the foregoing allegations as if restated fully herein.

74. Empire Wind, as operators of vessels and marine construction operations on navigable waters, owed Plaintiffs a duty to exercise reasonable care in the conduct of those operations. This duty includes the duty to avoid damaging their fixed fishing gear.

75. Empire Wind breached those duties by, among other things, conducting bottom–disturbing construction operations directly through the known locations of Plaintiffs' gear, and failing to adequately supervise contractors and vessels performing work on Empire Wind's behalf.

76. As a direct and proximate cause of Empire Wind's negligence, Plaintiffs have suffered economic losses due to their loss of property in an amount to be proven at trial.

**COUNT II**
**Negligence Under General Maritime Law**
**(Loss of Income and Economic Livelihood)**

77. Plaintiffs reallege and reincorporate the foregoing allegations as if restated fully herein.

78. Empire Wind, as operators of vessels and marine construction operations on navigable waters, and the operators of the offshore windmills now located in navigable waters, owed Plaintiffs—discrete, foreseeable, and identified class of claimants whose presence and dependence on the affected grounds were actually known to Empire Wind through, among other things, the project's own fisheries studies, compensation framework, communications with Plaintiffs, and federal approval conditions—a duty of reasonable care to conduct construction and windmill operations so as not to destroy or unreasonably impair the marine resources and grounds upon which those commercial fishermen's' livelihoods depend.

79. Under the general maritime law, commercial fishermen may recover for economic losses proximately caused by negligent injury to the marine resources and grounds they commercially harvest, as recognized by the well–established commercial fishermen exception to the economic–loss doctrine rule established in *Robins Dry Dock* for federal maritime law claims.

80. Empire Wind breached their duty through the negligent conduct of construction and marine operations alleged herein, including, among other

things, conducting bottom–disturbing construction operations that destroyed the natural marine habitat of the American lobster, failures of any reasonable coordination or mitigation related to the same, and failing to adequately supervise contractors and vessels performing work on Empire Wind's behalf.

81. As a direct and proximate cause of Empire Wind's negligence, Plaintiffs have suffered economic loss due, including lost catch, lost income, lost profits, increased operating costs, displacement costs, diminution of the going–concern value of the commercial lobster fishing business, in an amount exceeding $75,000 to be proven at trial.

**COUNT III**
**Conversion and Trespass of Chattels Under General Maritime Law**

82. Plaintiffs reallege and reincorporate the foregoing allegations as if restated fully herein.

83. By soliciting and receiving notice of the exact locations of Plaintiffs' deployed gear—which they had a legal, actual, and constructive possessory right to—, and by undertaking to advise these Plaintiffs of the nature and timing of marine operations affecting that gear, Empire Wind entered a relationship with these Plaintiffs in which Empire Wind possessed unique and superior knowledge of planned operations, knew these Plaintiffs sought and would rely upon that information to protect their property, and were the only available source of that information.

84. Empire Wind represented to these Plaintiffs that only sonar survey work, and not bottom-disturbing operations, would occur in the area of these Plaintiffs' gear during the relevant period. That representation was false, and Empire Wind failed to exercise reasonable care in making it or in ensuring operations conformed to it. Instead, Empire Wind intentionally conducted bottom-disturbing operations in a manner that they knew or recklessly disregarded would result in the destruction of Plaintiffs' gear.

85. Plaintiffs reasonably and foreseeably relied on the representation by leaving their gear deployed, and as a direct and proximate result suffered the destruction of their gear and associated losses in amounts to be proven at trial.

## COUNT IV
## Special Injury Public Nuisance Under New York Law

86. Plaintiffs reallege and reincorporate the foregoing allegations as if restated fully herein.

87. The navigable waters of the State of New York and the fisheries within them are subject to public rights of navigation and fishery held in common by the people of the State.

88. Empire Wind's construction and marine operations in and affecting New York waters—including trenching, cable-laying, seabed disturbance, sediment dispersion, obstruction of navigation, and exclusion of

fishing effort have intentionally and/or recklessly, and unreasonably interfered with and continue to interfere with the public rights of navigation and fishery and have created an abnormally dangerous or ultrahazardous condition vis-à-vis the destruction of commercial fishing gear and American lobster and tautog habitats.

89. Additionally, damage to navigable public waters which causes death to or contamination of fish or shellfish constitutes a public nuisance; the risk of this harm is great and observable from the death and disappearance of lobster and tautog.

90. This harm cannot be eliminated by exercise of reasonable care because the harm has already occurred, will continue to occur so long as Empire Wind continues to use sonar and seabed disrupting activities.

91. Empire Wind use of sonar and seabed disrupting activities is not common usage, but instead a highly specialized usage present only in this specific geographic location and use.

92. Empire Wind use of sonar and seabed disrupting activities is inappropriate because it is taking place in the American lobster and tautog fisheries where such organisms are uniquely harmed by the activity.

93. Empire Wind's dangerous activities outweigh community value because the destruction of the entire America lobster and tautog fisheries far outweighs the benefit provided by the sonar and seabed disrupting activities.

94. Under New York law, commercial fishermen have suffered a discrete injury for standing to seek damages for actions involving such waters from which they derive their living.

95. As commercial fishermen who earn their livelihoods by the direct exercise of the public right of fishery in the affected waters, Plaintiffs have suffered special injury different in kind, and not merely in degree, from that suffered by the public at large, including the loss of the commercial use of their traditional grounds, destruction of gear, lost catch, and lost income.

96. Empire Wind's intentional and/or reckless interference is continuing, and each day of continued unreasonable interference constitutes a continuing nuisance.

97. Empire Wind's conduct was not compelled by, and exceeded the careful and lawful scope of, any governmental authorization, including the conditions of the project's approvals concerning fisheries coordination, mitigation, and gear protection.

98. As a direct and proximate result, Plaintiffs have suffered and continue to suffer damages in amounts to be proven at trial. They are entitled to abatement of the continuing nuisance to the extent it persists and to punitive damages due to Empire Wind's willful, wanton, reckless and malicious activity.

## COUNT V
## Gross Negligence or Reckless Conduct Under Federal Maritime Law

99. Plaintiffs reallege and reincorporate the foregoing allegations as if restated fully herein.

100. Empire Wind knew about the dangers to damaging the American lobster's and tautog's natural marine habitat and its likely negative impact on commercial fishermen.

101. Empire Wind intentionally or recklessly disregarded, or were grossly negligent as to, the known dangers to damaging the American lobster's and tautog's natural marine habitat and its likely negative impact on commercial fishermen.

102. Empire Wind's intentional or reckless disregard of, or gross negligence towards, the known dangers to damaging the American lobster's and tautog's natural marine habitat, and its likely negative impact on commercial fishermen, demonstrate a callous disregard for Plaintiff's rights as commercial fishermen, actions that were intentional, wanton, reckless, malicious, and/or grossly negligent.

103. Empire Wind's intentional, willful, wanton, reckless, and malicious conduct warrants punitive damages, in addition to compensatory damages, in the amount awarded by the jury consistent with applicable law.

WHEREFORE, Plaintiffs Peter DiMeglio, Anthony DiMeglio, Carlo DiMeglio, and Timothy Hatch pray for judgment as follows:

A. A judgment against Defendants in favor of Plaintiffs for Plaintiffs' compensatory damages, in excess of $75,000.00, the exact amount of which to be determined at trial;

B. An award of punitive damages;

C. An award in Plaintiffs' favor for their interest, costs, disbursements, and reasonable attorneys' fees as allowed by law;

D. For such other and further relief as this Court deems just and equitable.

ECKLAND & BLANDO LLP

Dated: October 30, 2026

/S/ VINCE C. REUTER
Vince C. Reuter
Robert T. Dube Jr. (*pro hac vice forthcoming*)
Thomas L.Harshaw (*pro hac vice forthcoming*)
100 Washington Avenue South
Suite 1500
Minneapolis, MN 55401
(612) 236-0160
vreuter@ecklandblando.com
rdube@ecklandblando.com
tharshaw@ecklandblando.com

*Counsel for Plaintiffs*